THOMPSON, J.
 

 On April 1, 1927, at a special meeting convened at an early hour in the morning, in obedience to summons issued late the night before, the mayor and board of aldermen of the city of Gretna adopted an ordinance enlarging the corporate limits and taking in a large acreage extending up the Mississippi river.
 

 The precipitate and hasty action of the authorities was taken, it is said, to forestall a similar move of an up-river village which contemplated extending its limits so as to take in some of the same desirable territory.
 

 The city of Gretna, without' the additional territory, comprises an area of 821 acres, of which 253 is vacant and unimproved.
 

 It has a population of 11,560, whereas the territory proposed to be annexed comprises 1,862 acres, including 450 acres in the bed of the Mississippi river. A large portion of this acreage is open fields, farming and grazing lands. The population of the annexed territory is approximated to be between 4,000 and 6,000.
 

 The proceedings of the municipal authorities was had under Act 136 of 1898, known as the Lawrason Act, and Act 35 of 1924.
 

 These acts confer on municipal corporations the authority, without previous notice or publication, to extend or to contract their limits, and, under certain conditions, to consolidate, merge, or absorb one or more cities, towns, and villages.
 

 All that is required to enlarge or to contract the municipal limits is for the municipal authorities to adopt an ordinance defining the territory which it is proposed to include in or to exclude from the corporate limits, and to define the entire boundary as changed.
 

 The ordinance becomes operative one month after its passage and after it has been published as required by the statute.
 

 It is provided in the statute that any person interested may prosecute an appeal from the ordinance at any time before it becomes operative.
 

 In considering a case arising under Act 136 of 1898, this court, in N. O. & N. W. R. Co. v. Vidalia, 117 La. 571, 42 So. 142, said:
 

 “The legislative power of such corporations being delegated, sub modo, it is the right and
 
 *899
 
 duty of the courts to make a further inquiry whether, in its exercise, the condition upon which it was granted has been complied with— that condition being that ordinances enacted pursuant thereto shall be reasonable, impartial, fair, general in their application, and consistent with law, public policy, and common right.”
 

 In the case of Bowman-Hicks Lumber Co. v. Town of Oakdale, 144 La. 858, 81 So. 371, this court again said:
 

 “In conclusion, we may say' that, though there can be no doubt that the question of the reasonableness of a law, or ordinance, is of the very essence of legislation, and hence would seem to be one that it is no part of the function of the judiciary to determine, it is now well settled that the Legislature may confer upon agencies, such as municipal corporations, the power to enact reasonable legislation, within prescribed limits, and that it is for the courts to determine, in any given case, whether such agent has kept within, or has gone beyond, the limits of its mandate.”
 

 1 Section 4 of Act 136 of 1898 provides that the appeal from an ordinance enlarging the municipal limits. shall be by. suit in the district court against the city, town, or village, “and,
 
 the question shall he
 
 whether the proposed extension * * * of the corporate limits
 
 he or he not reasonable.”
 
 (Italics ours.)
 

 From the foregoing provision of the statute and the cases cited, we think it quite clear that any person having, an interest has the right to contest the. validity of an ox-dinanee as is here involved, on the ground, that it is unreasonable, and that the burden of proving such unreasonableness is upon the attacking .party. Unless and until such proof, is, made, the presumption of reasonableness attaches ' to the ordinance. This was the view expressed, substantially, in the cáse of Lawrence v. Mansfield, 129 La. 677, 56 So. 635 wherein the.court said:
 

 “The law has given-this cqurt jurisdiction to decide in matter'of these' extensions; .that is, decide whether- -the extension proposed' was reasonable or .unreasonable. , . • ...
 

 . “‘Unreasonable’,is, a'xyord, of extensive and. fax-oad meaning." ’The''evidence' of unreasdnableness is not always as persuasive as one may be inclined to think at first blush.
 

 “At any rate, in order to characterize the measure of a body as unreasonable, it must be made to appear by abundant evidence that it is unreasonable.”
 

 Within the period prescribed by the statute, the plaintiffs, some five corporations operating various industrial plants within the-territory sought to be brought within the city of Gretna, and twenty-four citizens and taxpayers residing in the said annexed territory, instituted this suit to have the ordinance referred to decreed to be unreasonable, null, void, and inoperative.
 

 It is alleged that a large majority of the residents of the territory sought to be annexed to the city of Gretna are opposed to the annexation; that the extension of the city limits was not sought for any purpose other than to subject the property in said territory to taxation by the city of Gretna for its benefit, and without corresponding benefit "to the property ox- to the residents of the territory to be annexed; that a greater part of the territory sought to be' annexed is occupied by farms, which are not suitable for incorporation within any municipality, and which could not be improved or benefited in any way by being within the limits of any municipality.
 

 It is further alleged that the territory sought to- be annexed contains ■ a peaceable, law-abiding population, which has nevex-, at any time, annoyed, threatened, or disturbed the peace, health, or security of the city of Gretna, or the inhabitants thereof.
 

 There are other allegations of fact tending to support the charge that the ordinance attacked is unreasonable, but we think the foregoing sufficient for the purposes of this discussion.
 

 ' The city of Gfretpa, through its mayor, answered, in part, that the area in'the proposed extension consists of a series of thickly populated commu'nities, all of which, for the
 
 *901
 
 benefit of the public welfare, public health, and public safety of the said communities, should be bound into a more harmonious union, so that proper developments can take place in such a manner as to best promote the public welfare, public safety, and the health and convenience of the inhabitants of the various communities residing in the proposed extensions.
 

 It is further alleged that the public welfare, public safety, public health, and public convenience of the masses should supersede the selfish desires of large corporate interests, the directing heads and managers of which live comfortably in the city of New Orleans, and, further, that the public welfare, public safety, public health, public convenience of the great mass of the residents of the proposed extension should not be throttled by the machinations of land barons, who retard the development of a community in order to gratify an insatiable desire to accumulate wealth at the expense of, and to the great injury of, the people residing in the community.
 

 It is further alleged that the health of the citizens of the city of Gretna demands that the residents of the proposed extension be furnished pure, fresh, drinking water, in order that diseases resulting from drinking water contained in cisterns, which are in use in the proposed extension, should be eliminated and not permitted to spread to the city of Gretna.
 

 After a protracted trial, the court rendered judgment in favor of the plaintiffs, declaring the ordinance unreasonable, and for- that reason null and void.
 

 There were quite a number of witnesses who testified in the case, nearly all of whom resided, at the time, in the territory sought to be annexed, and they all practically agree <pn the fact that the corporations owning ánd operating industrial plants in the annexed territory and a great majority of the individual citizens are presently opposed to having their property incorporated and placed under the control of the city of Gretna.
 

 The motive of the opposition, so far as the corporations are concerned, is obvious. The several industrial plants are located in the country, and are not subject to municipal taxes.
 

 On the other hand, it is equally manifest that one of the purposes, if not the dominant purpose, for which the annexation is desired is that the city of Gretna may get the increased revenue which the corporations and territory will bring to the municipality.
 

 It is in evidence that the assessment for taxing purposes for 1927 of the territory between the line of Gretna and Barataría boulevard (the proposed extension) was $5,-410,229, or a small fraction less than the total assessment of the city of Gretna prior to the annexation.
 

 We do not refer to the question- of increased revenue as'furnishing a criterion on which to determine the matter at issue, but as a circumstánce to be taken into consideration in arriving at a conclusion as to whether the ordinance was or was not reasonable,- and because ,of the contention on the one hand that the main purpose of the city was to secure the additional revenue,, while the city contends that the opposition is grounded on a desire to escape municipal taxes.
 

 In this connection, it might be well to observe that while the city of Gretna, in its answer, in.general terms, denies that the ordinance is unreasonable, it alleges no affirmative facts going to show that the enlargement of the limits was a reasonable exercise of legislative will and discretion, except the allegation that the health of the citizens of the city of Gretna demands that the residents of the proposed extension be furnished with pure, fresh,, drinking water, in order that diseases resulting from 'drink
 
 *903
 
 ing water contained in cisterns, which are in use in the proposed extension, should be eliminated and not permitted to spread to the city of Gretna.
 

 There is some testimony to the effect that some of the sickness in the annexed territory was caused from' the use of cistern water, but there is no evidence to show that this has affected the health of Gretna, which is the basis of the complaint on that score.
 

 It is further shown that Gretna has no supply of water for its own use, but secures its water by purchase from Algiers, and the quantity is limited to 400,000 gallons per day. The evidence shows that some of the plants in the annexed territory could not get a supply of water from Gretna, and had to construct their own pipe and pump.
 

 It is further shown that the various factories between Gretna and Barataría boulevard use between nine and ten million gallons of water daily, an amount approximately double the total capacity of Algiers, including the amount which Algiers supplies to Gretna.
 

 It is apparent, therefore, that the alleged reason for taking in the additional territory to preserve its population from sickness, due to bad water, and to supply good, wholesome, and healthy water, fails completely.
 

 But, still more than this, the answer of defendant admits that the people of the proposed extension had never, at any time, disturbed or threatened the health of the city of Gretna, or of its inhabitants.
 

 It appears that at a subsequent meeting of the board of aldermen, by a vote of 3 to 2, the ordinance making the extension was rescinded, but the action was rendered ineffective by the veto of the mayor.
 

 It also appears that the police jury of Jefferson parish, by resolution, requested the city of Gretna to repeal the ordinance as being detrimental to the best interests of the parish, but this too was in vain.
 

 It is true, neither the action of the police jury nor that of the aldermen in rescinding the ordinance can be said to furnish a criterion for guidance in determining the reasonableness of the annexation; still such action is somewhat persuasive, and coupled with other facts and circumstances of more or less weight, may serve to turn the scale in favor of that view. At all events, being the expressed will of legislative bodies, the one representing the parish at large, and the other the municipality, the action to some extent adds force to the contention that it is not the will of the people most directly interested that the limits should be extended.
 

 We shall not attempt to review nor to analyze the testimony of the many witnesses who testified in the case. The issue, after all, is one of fact. The trial judge had the witnesses before him, and, being upon the ground, as-it were, and having first-hand information of the conditions and situation, was in a much better position than we are to decide whether the ordinance was reasonable or .unreasonable.
 

 We are disposed to defer to his finding, especially in view of the fact that appellant has not pointed out any manifest error in the conclusion reached by the trial judge.
 

 We take the liberty of making some excerpts from the judge’s opinion a part of our opinion:
 

 “A great majority of the heads of families who reside in the area here involved are employed by the different factories on the river front, and who reside, generally, in the vicinity of such factories. Any added burdens in the shape of municipal taxes or levies for public improvements on the small homes which these citizens either own or rent must ultimately be borne by them. These burdens they are apparently unwilling or unable to assume. Besides this, I am satisfied that the various small and scattered settlements in this large territory are not sufficiently developed and have not a sufficient population to distribute the extra cost of municipal government and municipal improvements among enough people to make the cost reasonable to each individual.
 

 “There is uncontradieted testimony in the
 
 *905
 
 record from witnesses of experience and judgment to the effect that, if the ordinance before me is maintained, further industrial developments in this section will be seriously retarded. So far as there is any population in this territory, its presence is almost entirely due to the industrial development which has already taken place, and it is therefore obvious that, if this development ceases, additional growth of population will likewise cease with it. It appears that a substantial percentage of the people employed by these industries cross the river daily from the city of New Orleans, and I can only assume that those who have taken up their residence in the rear of the factories have done so because rents and other costs of living are lower in the country than in the city of New Orleans.
 

 “There are two railway stations and two post offices in the area sought to be annexed; namely, Harvey and Marrero. These small communities have had distinct identities and distinct objects and purposes for a very long period of time. I do not feel it reasonable to merge them into Gretna without their consent.
 

 “Geographical and physical conditions also weigh against the reasonableness of this extension. Immediately adjacent to the present city of Gretna are one or two industrial plants, highly developed, and built up with various tanks, tracks, sheds, and factory buildings, in such a way that the streets of Gretna which are parallel to the river could not be projected into the proposed extended area except at prohibitive cost, involving the destruction of these particular industries.”
 

 For reasons assigned, the judgment ap- ■ pealed from is affirmed.
 

 O’NIELL, O. J., takes no part.